# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-0495V
UNPUBLISHED

| | |
|---|---|
| CHARLES MARION,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: October 27, 2020<br><br>Special Processing Unit (SPU);<br>Dismissal; Site of Vaccination;<br>Onset; Prior Shoulder Pain; Influenza<br>(Flu) Vaccine; Shoulder Injury<br>Related to Vaccine Administration<br>(SIRVA) |

*Amy A. Senerth*, Muller Brazil, LLP, Dresher, PA, for petitioner.

*Claudia Barnes Gangi*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION[1]

On April 3, 2019, Charles Marion filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a right shoulder injury related to vaccine administration ("SIRVA") caused in fact by the influenza ("flu") vaccine administered to him on August 13, 2016.  Petition at 1, ¶¶ 2, 14. The case was assigned to the Special Processing Unit of the Office of Special Masters.

### I.   Procedural History

Along with the petition in this case, Petitioner filed his affidavit and medical records. Exhibits 1-9, ECF No. 1. He alleges that he received a flu vaccine on August 13, 2016, in

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

his right shoulder, but that "the young woman working behind the counter in the pharmacy changed the location [in the record of vaccination] to [his] left arm, [which was] not true." Exhibit 9 at ¶ 2. Additionally, Petitioner alleges that he felt sharp pain in his right shoulder immediately upon vaccination "that has turned into a debilitating, aching pain." *Id.* at ¶ 5. Although Petitioner admits that he "had a previous left shoulder injury, which completely resolved prior to receipt of the influenza vaccine on August 13, 2016" (*id.* at ¶ 4 (emphasis added); *accord.* Petition at ¶ 3), he maintains he "ha[s] no history of right shoulder pain or injuries." (Petition at ¶ 3 (emphasis added)).

During the initial status conference, held telephonically on June 3, 2019, the parties discussed the lack of evidence in the medical records supporting Petitioner's assertions, along with specific instances when this information contradicts Petitioner's claims. Order issued June 7, 2019, ECF No. 8. Respondent's counsel proposed that additional medical records and other evidence be obtained to address these deficiencies. *Id.*

On June 11, 2019, Petitioner filed a more comprehensive vaccine record which included the consent form signed by Petitioner. Exhibit 10, ECF No. 9. However, this consent form provides *further* evidence that Petitioner received the flu vaccine in his left deltoid, rather than right arm as alleged. For example, under the section listing the site of administration, the vaccine administrator circled the option for LA rather than RA. *Id.* at 6.

Over the subsequent six-month period, Petitioner was granted additional time on two occasions to obtain further evidence to support his claims. Non-pdf Orders issued Oct. 8 and Nov. 12, 2019. On December 9, 2019, he filed updated medical records from his current primary care provider ("PCP"), David Mayer, D.O., at Crestwood Family Practice, and better copies of the medical record from a November 21, 2016 visit to Community Urgent Care of Madison. Exhibits 11-12, ECF No. 14; *Compare* Exhibit 6 *with* Exhibit 12. These records provided no additional evidence regarding the deficiencies noted in Petitioner's case.

Telephonic status conferences were held on January 21 and February 27, 2020, and I issued an order to show cause on March 26, 2020. ECF No. 17. In this order, I stressed that Petitioner needed to provide additional evidence regarding his site of vaccination, onset of his right shoulder pain, and notations in the medical records which indicate that he experienced right shoulder pain several years prior to vaccination. *Id.* at 1.

Over the subsequent five-month period, Petitioner filed additional medical records from Dr. Mayer, described by Petitioner as "more complete records" (Status Report at 1, filed Aug. 31, 2020, ECF No. 26), an unsigned statement from his wife, and updated medical records from his orthopedist. Exhibits 13-15. In a status report filed on August

2

31, 2020, Petitioner indicated he "does not have any additional evidence to file in this case." Status Report at 2.

Petitioner has been afforded more than fourteen months to produce any additional evidence. The matter is now ripe for adjudication.

## II. Factual History as Set Forth in Medical Records

The earliest medical records filed in this case are from a visit to David S.H. Bell, M.D. on January 28, 2013. Exhibit 8 at 15-16.[3] Dr. Bell appears to be a former PCP who treated Petitioner until late 2015. Exhibit 7 at 4. This record indicates Petitioner had experienced prior pain in his left knee and right shoulder. His left knee pain was described as "still a little painful," but his right shoulder pain was noted to be "resolved." Exhibit 8 at 15. In the medical record from a February 10, 2014 visit to Dr. Bell, both left knee and right shoulder pain are described as "[r]esolved." Exhibit 7 at 14.

Throughout 2014-15, Petitioner was seen by Dr. Bell on five occasions for common medical conditions such as high blood pressure and cholesterol, gastroesophageal reflux disease (GERD), sleep apnea, and morbid obesity. Exhibit 7 at 2-18. Beginning in March 2015, Dr. Bell suspected Petitioner might be suffering from gallstones and then kidney stones. *Id.* at 10, 4-5 (respectively). Petitioner sought treatment from Dr. Vaughan twice in March and April 2016. Exhibit 8 at 3-10.

On August 13, 2016, Petitioner received a flu shot from Rite Aid Pharmacy. Exhibits 1, 10. The vaccine record lists the site of vaccination as "Left Upper Arm." Exhibit 1 at 2; Exhibit 10 at 5. Below Petitioner's signature on the consent form is the signature of the vaccine administrator, along with handwritten information regarding the vaccine's lot number and expiration date. Exhibit 10 at 6. For site, there is a choice between "RA" or "LA," with "LA" manually circled. *Id.*

According to the medical records, Petitioner first visited Dr. Mayer, his current PCP, to establish care on September 15, 2016. Exhibit 11 at 45-46.[4] At this visit, Petitioner

---

[3] Medical records from treatment provided by Dr. Bell in 2014-15 are contained in Exhibit 7. However, the record from this January 28, 2013 visit was filed in the medical records from Michael Vaughan, M.D. at MedHelp - Action Corporation. Exhibit 8 at 1-10. This exhibit also contains a copy of labs and a November 9, 2015 visit to Dr. Bell which also does appear in Exhibit 7 (*id.* at 11-14) and copies of medical records from Petitioner's cardiologist, Gregory L. Champoin, M.D. at Gastroenterology Associates, N.A.P.C. (*id.* at 17-31).

[4] As noted on his exhibit list, Petitioner originally filed Dr. Mayer's medical records as Exhibits 2 and 4. Initial Exhibit List, filed Apr. 3, 2019, ECF No. 1-2. Inexplicably, the medical records from some visits to Dr. Mayer were filed, not in these exhibits, but in the medical records from Petitioner's orthopedist. *E.g.,* Exhibit 3 at

informed Dr. Mayer that he had a test done in Birmingham which showed he has an enlarged aorta and needed a referral to a cardiologist. *Id.* at 45. He also reported that he had a cough "that comes and goes" since a 1992 trip to Mexico, causing him to "eat[] a lot of cough drops" and sometimes suffer from night sweats. *Id.* Included in the results of the physical examination performed by Dr. Mayer, however, is a report of "no arm pain on exertion." *Id.* at 46. Dr. Mayer prescribed medication for Petitioner's anxiety, GERD, and high blood pressure (*id.* at 45) and provided Petitioner with the requested cardiology referral (*id.* at 6).

There is nothing in the medical records from this September 15, 2016 visit to Dr. Mayer suggesting that Petitioner was suffering right shoulder pain. Under "Reviewed Medications", it is noted that a prescription for a flu vaccine was filled on August 13, 2016, but there is no indication of any issues involved with this vaccination, and the location of the vaccination is not specified. Exhibit 11 at 45. Under "Reviewed Surgical History", the record lists a colonoscopy in 2013 and undated <u>left</u> shoulder orthopedic surgery. *Id.* at 46.

Petitioner saw Dr. Mayer again on September 23, 2016, complaining of head and chest congestion and sinus drainage for approximately one week. Exhibit 11 at 44-45. Dr. Mayer diagnosed Petitioner with acute bronchitis and a chronic cough, prescribed medication to include an inhaler and nasal spray, and administered a DEPO-Medrol injection in Petitioner's left buttock. *Id.* Again, there is no indication of the right shoulder pain, Petitioner claims he was experiencing.

On November 21, 2016, Petitioner visited Community Urgent Care of Madison, complaining of a rash. Exhibit 12 at 7. He was diagnosed with contact dermatitis, administered a Kenalog injection, and prescribed other medication to include a Medrol dose pack. *Id.* at 7-8. A few weeks later, on December 2, 2016, he saw the cardiologist to who Dr. Mayer had referred him, William C. Robbins, M.D. Exhibit 2 at 20-29.[5] These medical records also do not contain evidence that Petitioner suffered from right shoulder pain.

The first medical record in which Petitioner complained of right shoulder pain post-vaccination comes from a call he placed to Dr. Mayer on February 16, 2017, to request a

---

32-38. Because the most recently filed copy of Dr. Mayer's medical records can be found in Exhibit 11, whenever possible, I will cite to that exhibit.

[5] It appears Petitioner did not request medical records from his cardiologist, Dr. Robbins at HH Heart Center. Final Exhibit List, filed Apr. 28, 2020, ECF No. 20-1. However, medical records from HH Heart Center can be found in the medical records from other providers. This record was contained in the medical records from Dr. Mayer.

4

referral to an orthopedist. Exhibit 2 at 30. When seen by Dr. Mayer a few days later, on February 27, 2017, Petitioner claimed that he had suffered from this pain since August 2016, but he did not mention the flu shot he received. Exhibit 11 at 43. Petitioner described his pain as "along the right shoulder area" (*id.*), indicated he had "used lots of ibuprofen" (*id.*), and requested a referral to an orthopedist (*id.* at 42). At this visit, Petitioner also discussed his visit to the cardiologist, Dr. Robbins, and his anxiety, requesting to try new medication. *Id.* Dr. Mayer diagnosed Petitioner with acute bursitis and ordered x-rays which showed no calcification but a "possible spur on the distal end of the clavicle." *Id.* at 43; *see also id.* at 47 (x-ray results).

In April 2017, Petitioner returned to his previous PCP, Dr. Bell, "because of poor medical care based on his insurance." Exhibit 7 at 1. The medical record from that visit indicates Petitioner's "major problem seems to be that he his is not sleeping and has anxiety." *Id.* Dr. Belll prescribed the Klonopin requested by Petitioner but recommended that he try Melatonin and seek care for his sleep apnea from Dr. Patrick O'Neal, a physician with an office close to where Petitioner currently lives. *Id.* There is no mention of right shoulder pain in the record from this visit. The very next month, however, Petitioner called Dr. Mayer again regarding his right shoulder pain. Exhibit 2 at 30. He reported that his pain had not improved and that he wanted the orthopedic referral discussed in February. *Id.*

On May 30, 2017, Petitioner was seen by Eric Janssen, M.D. at SportsMED Orthopaedic & Spine Center for right shoulder pain which "started last August after a flu shot." Exhibit 15 at 11.[6] Petitioner stated at this time that he had previous surgery, described as "open reconstruction for dislocations on his left shoulder possibly 30 years ago." *Id.* He added that he had been taking ibuprofen, tramadol, and Tylenol. Although Petitioner claimed to "have received a corticosteroid injection a few months ago" which provided no relief, there is no mention of this injection in the medical records filed in this case. *Id.*

During his examination, Dr. Janssen observed tenderness on the most lateral aspect of Petitioner's shoulder, good range of motion with pain on the extremes, and some weakness on external rotation and abduction. Exhibit 15 at 12. He prescribed Toradol and an MRI to rule out a rotator cuff tear. *Id.* Performed in early June 2017, the MRI showed a "[p]artial thickness undersurface tear of the supraspinatus, . . . [a] [p]artial thickness undersurface tear of the infraspinatus, [t]endinosis of the intra-articular biceps tendon, [and a] [s]mall amount of fluid in the subcoracoid bursa." *Id.* at 13.

---

[6] These medical records have been filed on several occasions. *E.g.* Exhibits 4, 6, 11. I will cite the most recent version, filed on April 28, 2020. *See* Exhibit 15.

5

Petitioner saw Dr. Janssen again on June 5, 2017 to discuss the results of the MRI. Exhibit 15 at 9. Dr, Janssen administered a cortisone injection and prescribed physical therapy ("PT") and medication to help Petitioner sleep. *Id.* at 10. It appears, however, that Petitioner attended only one PT session (on July 17, 2017). Exhibit 15 at 16-19. After assessing Petitioner's limitations, the physical therapist recommended "skilled physical therapy in conjunction with a home exercise program" for approximately six weeks. *Id.* at 17. When seen by Dr, Janssen on July 21, 2017, Petitioner reported that "[t]herapy released him [because they] didn't feel like they can do much more for him at this time." *Id.* at 7. Dr. Janssen administered another cortisone injection[7] and instructed Petitioner to continue with his home exercises. *Id.* at 8. He added that he had briefly discussed surgery if needed in the future.

On October 3, 2017, Petitioner was formally discharged from PT for failure to "complete [his] current plan of care." Exhibit 15 at 22. It thereafter appears that he did not receive further treatment until 2018, when he was seen by Dr. Mayer for prescription refills and congestion on February 5, 2018. Exhibit 13 at 20. At that visit, Petitioner reported having a cough for one to two months. Stating that he was "unable to do PT," he requested Tramadol and a different anxiety medication. *Id.* As he did when treating Petitioner for congestion in September 2015, Dr. Mayer administered a Depo-Medrol injection, this time in Petitioner's right hip, and prescribed medication for Petitioner's cough, right shoulder pain, and anxiety. *Id.* at 23.

There is another lengthy gap in the records before Petitioner was seen again by Dr. Mayer on December 18, 2018, for significant head and chest congestion and coughing. Exhibit 15 at 17. He also requested a colonoscopy. *Id.* On November 13, 2019, he complained of "burning and aching in both knees, also pain and numbness in [his] feet and toes" for six months. *Id.* at 11. This is the most recent medical record filed by Petitioner.

### III.     Applicable Legal Standards

Under Section 13(a)(1)(A) of the Act, a petitioner must demonstrate, by a preponderance of the evidence, that all requirements for a petition set forth in section 11(c)(1) have been satisfied. A petitioner may prevail on her claim if the vaccinee for whom she seeks compensation has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Vaccine Injury Table (the Table). Section 11(c)(1)(C)(i). The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination.

---

[7] Dr. Janssen described the injection as Petitioner's third, noting that he had administered the second injection and the first had been "done elsewhere." Exhibit 15 at 8.

Section 14(a). If petitioner establishes that the vaccinee has suffered a "Table Injury," causation is presumed.

If, however, the vaccinee suffered an injury that either is not listed in the Table or did not occur within the prescribed time frame, petitioner must prove that the administered vaccine caused injury to receive Program compensation on behalf of the vaccinee. Section 11(c)(1)(C)(ii) and (iii). In such circumstances, petitioner asserts a "non-Table or [an] off-Table" claim and to prevail, petitioner must prove her claim by preponderant evidence. Section 13(a)(1)(A). This standard is "one of . . . simple preponderance, or 'more probable than not' causation." *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1279-80 (Fed. Cir. 2005) (referencing *Hellebrand v. Sec'y of Health & Human Servs.*, 999 F.2d 1565, 1572-73 (Fed. Cir. 1993). The Federal Circuit has held that to establish an off-Table injury, petitioners must "prove . . . that the vaccine was not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1351 (Fed. Cir 1999). *Id.* at 1352. The received vaccine, however, need not be the predominant cause of the injury. *Id.* at 1351.

The Circuit Court has indicated that petitioners "must show 'a medical theory causally connecting the vaccination and the injury'" to establish that the vaccine was a substantial factor in bringing about the injury. *Shyface*, 165 F.3d at 1352-53 (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). The Circuit Court added that "[t]here must be a 'logical sequence of cause and effect showing that the vaccination was the reason for the injury.'" *Id.* The Federal Circuit subsequently reiterated these requirements in its *Althen* decision. *See* 418 F.3d at 1278. *Althen* requires a petitioner

> to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Id.* All three prongs of *Althen* must be satisfied. *Id.*

Finding a petitioner is entitled to compensation must not be "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a)(1). Further, contemporaneous medical records are presumed to be accurate and complete in their recording of all relevant information as to petitioner's medical issues.

7

*Cucuras v. Sec'y of Health & Human Servs.*, 993, F.2d 1525, 1528 (Fed. Cir. 1993). Testimony offered after the events in questions is considered less reliable than contemporaneous reports because the need for accurate explanation of symptoms is more immediate. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

"It must [also] be recognized that the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance. Since medical records typically record only a fraction of all that occurs, the fact that reference to an event is omitted from the medical records may not be very significant." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (Fed. Cl. 1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992). However, in balancing these considerations, special masters in this Program have in most cases declined to credit later testimony over contemporaneous records. *See, e.g.*, *Stevens v. Sec'y of Health & Human Servs.*, No. 90–221V, 1990 WL 608693, at *3 (Cl. Ct. Spec. Mstr. Dec. 21, 1990); *Vergara v. Sec'y of Health & Human Servs.*, No. 08–882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. July 17, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recounted in later medical histories, affidavits, or trial testimony."); *see also Cucuras*, 993 F.2d at 1528 (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight")).

## IV.   Analysis

Since the initial status conference, Petitioner has filed only two additional documents addressing the factual deficiencies of his claim. The first, additional documentation (regarding vaccination) actually further *undermines* his contention that he received the vaccine alleged as causal in his injured right arm. The second (an unsigned statement from Petitioner's wife) echoes Petitioner's allegations regarding the site of vaccination and onset of his pain but does not address evidence that Petitioner suffered prior right shoulder pain. And given that this statement is unsigned, it has less evidentiary value than it would if signed under penalty of perjury or if the signature was notarized.

In addition, although Petitioner filed updated medical records from several of Petitioner's treating physicians, none of these records provide any additional evidence regarding the deficiencies in Petitioner's case, first noted in June 2019. Petitioner has had ample opportunity to produce the evidence needed to overcome these deficiencies and has failed to do so.

While Petitioner's assertions regarding the onset of his pain and lack of prior right shoulder pain are required to establish that he suffered a Table SIRVA,[8] they are not needed to prove causation. Thus, his inability to meet the Table requirements of onset is not per se fatal to the claim. However, Petitioner cannot prevail, Table or not, if he is unable to establish that he received the vaccine alleged as causal in his injured right arm. Because a discussion of the evidence in all areas is relevant to this issue and in order to provide a comprehensive analysis of the merits of Petitioner's case, I will discuss all three allegations.

### A.     Prior Right Shoulder Pain

Petitioner admits that he suffered from a prior left shoulder injury, now resolved, but maintains that he never experienced any right shoulder pain or injuries. Exhibit 9 at ¶ 4; Petition at ¶ 3. He describes his left shoulder injury as a fall which required "an operation to repair it." Exhibit 9 at ¶ 4.

The medical records support Petitioner's assertions regarding his prior <u>left</u> shoulder pain, as they contain references to left shoulder surgery approximately 30 years

---

[8] Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine.  42 C.F.R. § 100.3(a)(XIV) (2017). The criteria establishing a SIRVA under the accompanying *Qualification and Aids to Interpretation* are as follows:

> *Shoulder injury related to vaccine administration (SIRVA).* SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic  studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

earlier. However, they contradict his claim that he suffered no prior <u>right</u> shoulder pain. There are entries in the medical records from 2013-14 which reference left knee and right shoulder pain. By 2014, the pain in both areas was described as resolved. Later medical records show Petitioner again suffered from knee pain in 2019, this time in both knees.

Despite being instructed, on multiple occasions, to address the references regarding prior <u>right</u> shoulder pain, Petitioner has failed to do so. Obtaining additional medical records describing any treatment received for this pain could have provided important additional information. Even if unable to provide any medical records, at a minimum, Petitioner could have filed an amended affidavit addressing these earlier entries. Since Petitioner has not done so, I conclude the information contained in medical records showing prior <u>right</u> shoulder pain is correct. This is a factor that limits Petitioner's ability to pursue a Table SIRVA claim.

### B.    Onset of Right Shoulder Pain after Vaccination

Petitioner asserts that he felt pain in his right shoulder immediately upon vaccination. Exhibit 9 at ¶ 5. He describes it as "a sharp pain that has turned into a debilitating, aching pain." *Id.* Both Petitioner and his wife allege that Petitioner complained of his pain on the day of vaccination. *Id.*; Exhibit 14 at 1. Additionally, Petitioner maintains that he "told [his] primary physician Dr. Mayer, that [he] had pain in [his] right shoulder during [his] yearly check up two weeks after the flu shot." Exhibit 9 at ¶ 5; *accord.* Petition at ¶ 4.

However, the medical record from Petitioner's September 15, 2016 visit to Dr. Mayer contains no mention of this complaint. Exhibit 11 at 45-46. The omission is significant, for the record *does* provide ample details regarding Petitioner's other medical conditions, and reveals that Dr. Mayer performed a thorough physical exam. *Id.* at 46. There also is no mention of right shoulder pain in the medical records from visits to Dr. Mayer on September 23, 2016, to Community Urgent Care of Madison on November 21, 2016, and to the cardiologist on December 2, 2016.

The medical record further establishes that Petitioner did not complain of his right shoulder pain until more than six months after vaccination, when he called Dr. Mayer on February 16, 2017, seeking a referral to an orthopedist. Exhibit 2 at 30. When seen by Dr. Mayer on February 27, 2017, Petitioner first reported that he had suffered right shoulder pain since August 2016, but does not mention the flu vaccine he received on August 13th. Exhibit 11 at 43. And Petitioner did not link his right shoulder pain to the flu vaccine until May 30, 2017. At this appointment with Dr. Janssen, he reported only that his pain "started last August after a flu shot." Exhibit 15 at 11. He does not specify what

is meant by the term "after," or the amount of time between vaccination and the onset of his pain.

Generally, information contained in contemporaneously created medicals records is considered trustworthy because it is provided close in time to the events in question for the purpose of obtaining medical care. *Cucuras,* 993 F.2d at 1528. Thus, even when the information in a record was provided to a treater by a claimant, it is still considered more trustworthy than allegations made at the time a petition is filed, or thereafter. Here, multiple medical records created within six months of vaccination do not contain any reference to right shoulder pain, while describing in great detail other conditions and symptoms. By contrast, the only medical records providing some support for Petitioner's current allegation regarding onset were created more than six months after vaccination, but are not specific regarding onset. Petitioner did not even mention the flu shot alleged as causal, or identify it as the source of his pain, until more than nine months after vaccination.

These later-created medical records are not sufficient to overcome the lack of any earlier mention of right shoulder pain immediately upon vaccination. Petitioner has failed to provide preponderant evidence that the onset of the right shoulder pain he complained of in 2017 occurred immediately upon vaccination, as he alleges. As a result, this is a second issue preventing Petitioner from proceeding with a Table SIRVA claim.

### C.     Site of Vaccination

The site of vaccination is not identified in the Petition. In his affidavit, Petitioner maintains that he, his wife, and his son all received flu vaccines in their right arms as they were sitting in the Rite Aid Pharmacy waiting area. Exhibit 9 at ¶ 3. Regarding the vaccine administrator, Petitioner states that "the female pharmacist was self absorbed and did not seem to focused on what she was doing." *Id.* Petitioner claims that "[w]hen [he] went back to get the paperwork about [his] shot, the young woman working behind the counter is the pharmacy changed the location to [his] left arm, but that . . . [t]he shot was given in [his] right arm." *Id.* at ¶ 2.

In her unsigned statement, Petitioner's wife echoes these claims. Exhibit 14 at 1-2. However, when discussing the alleged alteration to the vaccine record, it is clear that she is relaying second-hand information provided to her by the Petitioner. *Id.* at 2. Neither Petitioner nor his wife indicates the date when this alternation occurred, only that it was when Petitioner returned to Rite Aid to obtain his paperwork. *Id.*; Exhibit 9 at ¶ 2.

The vaccine record initially filed establishes that the flu vaccine alleged as causal was administered in Petitioner's upper *left* arm. Exhibit 1 at 2. This entry, which most

likely was created within the computerized records maintained at the Rite Aid Pharmacy, appears as follows:

### Site of Admin: Left Upper Arm

Petitioner later obtained and filed a more complete vaccine record which included the consent form he signed when the vaccination was administered. Exhibit 10. Beneath Petitioner's signature are additional details regarding the administered vaccine, including lot number, expiration date, the administrator's signature and license number, and further information regarding the site of vaccination. *Id.* at 6. All details are written on the form presumably by the vaccine administrator. The notation regarding site of vaccination is comprised of typed options for "RA" or "LA" with the "LA" choice manually circled as follows:

```
        WTS2005
Exp Date  5-26-17
Site RA or (LA) Circle One
```

Given that the vaccine administrator was required to manually circle the notation on the consent form, this entry provides substantial evidence corroborating the conclusion that the vaccine was administered in Petitioner's left arm.

I previously have determined that a petitioner provided sufficient evidence to rebut the site of administration listed in her vaccine record. *Rodgers v. Sec'y of Health & Human Servs.,* No. 18-0559V, 2020 WL 1870268 (Fed. Cl. Spec. Mstr. Mar. 11, 2020); *Gallo v. Sec'y of Health & Human Servs.,* No. 18-1298V, 2019 WL 7496617 (Fed. Cl. Spec. Mstr. Dec. 5, 2019). However, these cases involved consistent and multiple reports of pain attributed to the vaccination alleged as being administered in the injured shoulder, along with efforts to obtain treatment far closer in time to vaccination. *Rodgers*, 2020 WL 1870268, at *3-4; *Gallo*, 2019 WL 7496617, at *3-4. In *Gallo*, for example, the first report of pain occurred the day after vaccination. 2019 WL 7496617, at *3. In *Rodgers*, the petitioner complained of shoulder pain attributed to the vaccination she received on four occasions during the month following vaccination. 2020 WL 1870268, at *3. Furthermore, as noted in *Rodgers,* these cases involved computerized vaccine records which requires little thought or effort on the part of the vaccine administrator when identifying the site of vaccination. 2020 WL 1870268, at *5.

According to the medical records filed in this case, Petitioner did not complain of right shoulder pain until more than six months after vaccination and did not attribute his right shoulder pain to the vaccine he received on August 13, 2016 until an additional three

12

months thereafter. During the six months following vaccination, Petitioner sought medical care on four occasions, but the medical records from these visits contain no mention of right shoulder pain or any issues related to the August 13, 2016 vaccination. Additionally, the medical records show that Petitioner suffered from right shoulder and left knee pain several years prior to vaccination, and Petitioner has not addressed this prior right shoulder pain.

Information provided in contemporaneously created medical records are afforded greater weight because memories of specific events tend to fade over time. In this case, the medical records created closer in time to the vaccination directly contradict the information Petitioner provided more than six and nine months after vaccination. Thus, they diminish the value of these later claims. The later-provided histories and later allegations of Petitioner and his wife are not sufficient to overcome the clear evidence provided in the vaccine record.

Reviewing the entire record in this case, I find that Petitioner has not provided preponderant evidence to establish that he received the flu vaccine administered on August 13, 2018 in his right, rather than left arm. This point alone is enough to support dismissal of the claim regardless of its framing as Table or not.

### V.   Conclusion

To date, and despite ample opportunity, Petitioner has failed to file evidence to address numerous deficiencies noted in his case. Most problematic, he has failed to provide preponderant evidence showing that he received the flu vaccine alleged as causal in his injured right arm, rather than his left deltoid as indicated in the vaccine record.

Petitioner was informed that failure to file the required medical records and other evidence would be treated as either a failure to prosecute this claim or as an inability to provide supporting documentation for this claim. Accordingly, this case is DISMISSED for failure to prosecute.  The clerk shall enter judgment accordingly.[9]

**IT IS SO ORDERED.**

> **s/Brian H. Corcoran**
> Brian H. Corcoran
> Chief Special Master

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.